NUNNELLY et al. v. FIRST FEDERAL BUILDING & LOAN ASS'N OF OGDEN et al.

No. 6657. Decided December 27, 1944. (154 P. 2d 620.)

Rehearing denied May 18, 1945.

See 12 C. J. S. Building and Loan Associations, Sec. 58; Identity of interests essential to representative or class, suit, note 132 A. L. R. 750. See also, 39 Am. Jur., 921.

*E. A. Walton, Parnell Black* and *H. Leslie Hedrick,* all of Salt Lake City, for appellants.

*Farnsworth & Van Cott,* of Salt Lake City, *Stuart P. Dobbs,* of Ogden, and *E. C. Wiley* and *Stephens, Brayton & Lowe,* all of Salt Lake City, for respondents.

WOLFE, Chief Justice.

This is an appeal from a judgment of dismissal after entry of an order sustaining the demurrer to the complaint. Plaintiffs Nunnelly and Taylor previously dismissed without prejudice and filed separate complaints, so they are not directly interested in this appeal. Numerous grounds of demurrer were interposed by the defendants. While the lower court overruled the demurrer as to the ground urged that the complaint does not state facts sufficient to constitute a cause of action, it sustained the demurrer on various grounds of misjoinder, uncertainty and multi-

fariousness. The complaint, omitting all formal recitals as to the identity of the parties, in substance alleges:

1. That the plaintiffs named sue in their own behalf and in behalf of all others similarly situated who may desire to join and participate in the benefits; that the questions involved are of common and general interest to many people similarly situated and who are so numerous that it is impracticable to bring all of them before the court.

2. That prior to federalization the defendant Ogden First Federal Savings & Loan Association was known as Colonial Building & Loan Association (hereinafter referred to as the "Association"), and all of the wrongs complained of occurred at a time prior to such federalization. That the defendant Colonial Corporation, at the time the acts complained of occurred, was the owner of all of the common stock of the Association of the par value of $100,000; that by the provisions of the Association's articles of incorporation, holders of such common stock (called "reserve stock") were not entitled to participate in any of the corporate assets until the owners of "investment certificates" were paid in full; but that by and through the operation of a scheme hereinafter mentioned and without payment of more than a fractional part of the amounts owing on such investment certificates, the Association delivered $85,000 of its assets to Colonial Corporation to liquidate the said common stock.

3. That in 1933, about the time the scheme complained of was initiated, there were outstanding in fully paid investment stock $340,000 and liabilities on installment investment certificates of about $1,000,000; that the Association was operating as a savings and loan association under the laws of Utah; that each of the plaintiffs specifically named in the complaint was the owner of fully paid certificates and that the plaintiffs and owners had given due and proper notice of their desire to withdraw the same; that the Association had promised to pay the same in full and that the financial condition of said Association was such that

it could have paid the same, either in full or at least about 95% thereof.

4. That at the time of the acts complained of the directors of Colonial Corporation were, with one exception, the identical persons who were directors of the Association; that through said directors and through the ownership of the Association's common stock, Colonial Corporation controlled the Association, its policies and activities; that in 1933 the defendants, acting with the directors of said two corporations and with other persons, entered into a conspiracy to defraud the plaintiffs and other owners of investment certificates by obtaining their certificates without paying the sums due and owing thereon; that pursuant to this conspiracy the defendants concealed from the plaintiffs and other investors the true financial condition of the Association and by false advertising and through agents and third parties created the impression that the Association was insolvent, that it was likely to be thrown into receivership and that the certificates had slight, if any, value; that the defendants created a sham and fictitious market in Salt Lake City, Utah, in order to obtain the certificates for a small fraction of their actual worth; that defendants furnished to agents and third parties lists of names and addresses of the owners of such certificates for the purposes of accomplishing the aforesaid fraud; that they paid large and exorbitant salaries and commissions to officers, agents and third party instrumentalities and diverted assets of the Association for the liquidation of common stock when such assets were only sufficient to and should have been used to liquidate the certificates of the plaintiffs and of other investors; that they "in some instances" diverted funds from the Association, which funds were used to acquire the certificates from the plaintiffs and other owners, all of which was done for the deceitful, wicked and wrongful purpose of acquiring said certificates at unconscionably low prices and in some instances for nothing at all, and for the further purpose of enhancing the value

of investment certificates held by some of the defendants and to give value to the common stock.

5. That between 1934 and 1936, through the aforesaid scheme, the certificates owned by plaintiffs and other owners were obtained from them without payment of the amounts owing thereon, but on the contrary were obtained "for practically nothing" by delivery to the respective owners of various "properties of no substantial value"; that the transfer of its assets to Colonial Corporation rendered the Association insolvent; that the Colonial Corporation is also insolvent; that notwithstanding said insolvency Ogden First Federal Savings & Loan Association, successor to the Association, and said Colonial Corporation have been paying dividends to certain stockholders, that said payments have been made from capital; that unless restrained by the court said defendants will continue to make said dividend payments.

6. That the defendant, Ogden First Federal Savings & Loan Association, claims to be the owner of the plaintiff's investment certificates by reasons of said fraudulent purchases and threatens to cancel and retire the same; that plaintiffs aver that any pretended purchase of the certificate is ultra vires and void.

7. That the amounts due to the plaintiffs and other investment certificate holders similarly situated are so large that said Association cannot pay them in full and upon a marshaling of assets and liabilities it would be necessary for the plaintiffs and other persons similarly situated to take and receive less than the par value of their certificates and to pro rate the loss.

8. That the plaintiffs did not discover the existence of any of said frauds until within the last two and one-half years.

The plaintiffs pray that they be adjudged the owners of the investment certificates; that they be given a judgment against the defendants for the unpaid amounts thereof; that the defendants be required to account; that defendants

be enjoined from canceling said certificates; that a receiver be appointed to conserve the assets of the Association and Colonial Corporation; that judgment be entered against Colonial Corporation for the use and benefit of the Association and plaintiffs for the amount of the assets of the Association turned over to Colonial Corporation; that there be a marshaling of the assets and liabilities of the Association and its successor and a liquidation thereof; and that the defendants be enjoined from paying dividends or otherwise distributing their capital.

The ruling of the trial court on the general demurrer is not questioned by way of cross-assignment or cross-appeal. There is, however, some argument in the briefs to the effect that the complaint fails to state a cause of action. The contention is without merit. The Association and its directors owed to the investors a duty to refrain from any activity which would mislead them to their prejudice. *Badger & Co.* v. *Fidelity Building & Loan Association,* 94 Utah 97, 75 P. 2d 669; *Markey* v. *Hibernia Homestead Association,* La. App., 186 S. 757. The complaint clearly shows a scheme on the part of the defendants to acquire the plaintiffs' certificates for amounts considerably less than was due on them. The scheme involved the dissemination of false information calculated to mislead the plaintiffs into believing that their certificates were valueless; the creation of a sham and fictitious market; the purchase of the certificates through undisclosed agents; the wrongful transfer of assets from the Association even though there were not sufficient assets to pay the various outstanding certificates in full. The complaint shows a clear case of over-reaching. We need go no further. The lower court correctly held that this complaint states a cause of action.

Upon motion of the defendants, the trial court struck from the complaint all allegations by which the plaintiffs sought to sue in behalf of other unnamed persons alleged to be similarly situated. The plaintiffs' first assignment of error questions the correctness of this ruling.

The various provisions in the Utah Code relating to joinder of parties and representative or class suits are as follows:

104-3-12, U. C. A. 1943:

"All persons having an interest in the subject of the action and in obtaining the relief demanded may be joined as plaintiffs, except when otherwise provided in this code." (This is commonly known as the permissive joinder of plaintiffs' section.)

104-3-13, U. C. A. 1943:

"Any person may be made a defendant who has or claims an interest in the controversy adverse to the plaintiff, or who is a necessary party to a complete determination or settlement of the question involved therein. * * *" (Known as the permissive joinder of defendants' section.)

104-3-16, U. C. A. 1943:

"Of the parties to an action, those who are united in interest must be joined as plaintiffs or defendants; but if the consent of any one who should have been joined as plaintiff cannot be obtained, he may be made a defendant, the reason thereof being stated in the complaint; and when the question is one of a common or general interest of many persons, or when the parties are numerous and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all." (Known as the compulsory joinder section but also covers provisions authorizing representative suits.)

The above quoted statutes are almost identical in language to provisions embodied in the codes of nearly all the states. These codes were patterned after the Field Code as adopted by New York in 1849.

The provisions governing permissive joinder of both plaintiffs and defendants and the first sentence of Section 104-3-16 relating to compulsory joinder were all recommended by the Field Code Commission in 1848. The latter portion of Section 104-3-16 relating to representative suits was added by the New York Assembly in 1849. The language relating to representative suits was apparently taken by the New York Assembly from statements made

by Mr. Justice Story in his work on Equity Pleading published about ten years prior to the adoption of the statute. See Blume, "The 'Common Questions' Principle in the Code Provision for Representative Suits," 30 Mich. Law Rev. 878; *Tobin* v. *Portland Flouring Mills Co.*, 41 Or. 269, 68 P. 743, 1108.

Judge Story in his work on Equity Pleading, 9th Ed., § 72, in speaking upon this subject, says:

"It is the constant aim of courts of equity to do complete justice, by deciding upon and settling the rights of all persons interested in the subject-matter of the suit, so that the performance of the decree of the court may be perfectly safe to those who are compelled to obey it, and also that future litigations may be prevented."

Story notes that in an action at law no more parties are required than those immediately interested in the subject matter, but in equity those remotely interested therein may be joined, and are often necessary parties. Id. § 76. Then in section 92, Story in speaking of certain deviations from the rule observes that:

"The most usual cases arranging themselves under this head of exceptions are (1) where the question is one of a common or general interest and one or more may sue or defend for the benefit of the whole; (2) where the parties form a voluntary association for public or private purposes, and those who sue or defend may fairly be presumed to represent the rights and interest of the whole; (3) where the parties are very numerous, and although they have, or may have, separate, distinct interest, yet it is impracticable to bring them all before the court."

In adopting these various equity rules as a part of the codes it cannot be assumed that the Legislature was attempting to restrict the powers of the courts in this regard. See *Tobin* v. *Portland Flouring Mills Co.*, supra. The whole objective of the code commissions was to liberalize practice and to adopt in law cases, at least in a large part, the liberal equity rules. Thus in *McKenzie* v. *L'Amoureaux*, 11 Barb., N. Y., 516, in discussing the exceptions noted by Judge Story and in explaining the

adoption of the section of the Code covering representative suits, the court said:

"So far was the legislature from intending any change in the rule on this subject, that in making the great changes contemplated by the adoption of the code, it was careful to preserve this convenient practice of the court of chancery. The code commissioners had reported a section, copied substantially from one of the rules of the supreme court of the United States, providing that those who are united in interest must be joined as plaintiffs or defendants, except that, if the consent of any one who should have been joined as plaintiff, cannot be obtained, he may be made a defendant, the reason thereof being stated in the complaint. This too was the practice in the court of chancery. The legislature adopted the provision thus reported, but added to the section as follows: 'And when the question is one of a common or general interest of many persons; or when the parties are very numerous and it may be impracticable to bring them all before the court, one or more may sue or defend for the benefit of the whole.' (Code, § 119.) This was also in accordance with the then existing practice of courts of equity. The legislature seems to have apprehended that, by adopting the rule reported by the commissioners, it might be understood to have rejected the kindred rules embraced in the latter clause of the section. To prevent this misapprehension the latter clause was added, thus retaining in the new practice the same rules by which to determine whether the proper parties were before the court, which then prevailed in the court of chancery."

This equity rule which has now found expression in the above Code provision, should under familiar rules of statutory construction be construed in the light of the early equity court decisions which give it content.

The fact that Story's work on Equity Pleading from which the language of this Code provisions was adopted treated the representative suit as an exception to the rule that all persons legally or beneficially interested in the subject matter, or object, of the suit should be made parties, was probably one of the reasons why the New York assembly hooked this provision onto the end of the compulsory joinder section. These two factors have been given considerable weight by courts in construing the representative suit provision. Some courts have adopted the view that

class suits may only be brought when joinder of parties would be required but is excused because of the large number of persons involved. Such was the express holding of the Iowa Supreme Court in *Fleming* v. *Mershon,* 36 Iowa 413, Cole, J., dissenting. In the case of *Carey* v. *Brown,* 58 Cal. 180, 183 the court stated:

"It seems to us that the code permits one to sue or defend for the benefit of many persons, only in cases where they are so united in interest with the person who brings the action or defends against it, as to make them necessary parties, under the first clause of § 382, Code Civ. Proc. which precedes the clause that authorizes one to sue or defend for many." See also discussion *Bouton* v. *City of Brooklyn,* 15 Barb., N. Y., 375, 390ff; annotation in 132 A. L. R. 749, wherein it is stated that the doctrine of virtual representation is an exception to the compulsory joinder rule; *Hansberry* v. *Lee,* 61 S. Ct. 115, 311 U. S. 32, 85 L. Ed. 22, 132 A. L. R. 741, wherein it is stated that the representative suit device was invented to remedy a technical defect of parties; Clark, "Code Pleading," 280, n. 202.

Blume, in his article in 30 Mich. Law Rev. 878, supra, takes a somewhat contrary position. His views are based primarily upon the fact that in equity both before and since the Codes, suits have been permitted to proceed in the form of representative suits even though one or more could have sued alone. His argument is well supplemented with citation of cases from various jurisdictions wherein representative suits have been allowed even though one could have sued alone. Blume notes, however, at page 897, that

"there is doubt as to whether a suit brought by one or more of a class for the benefit of all, when each could have sued alone, is, in any proper sense, a representative suit." Clark notes that "These actions for damages, where joinder is permissive, but not compulsory have been called 'non-derivative representative actions.' See, for example, *Aktins* v. *Trowbridge,* 1st Dept. 1914, 162 App. Div. 629, 148 N. Y. S. 181; 4 Cook, Corporations, 8th Ed. 1923, § 748. This terminology seems confusing, because the main features of a representative suit are lacking. True, outsiders are allowed to join as plaintiffs, but the cause is rather one of intervention or of consolidation of actions." See Clark, "Code Pleading," p. 280, n. 202.

We conclude that the first requirement of a true representative suit is that it be made to appear from the complaint that those in whose behalf the suit is brought occupy such a position in regard to the subject matter of the litigation that their joinder would be necessary were it not for their large number. To determine whether or not the parties would be necessary parties in any given case recourse should be had to the equity decisions prior to the adoption of the code.

"The aim of the equity courts was to settle an entire transaction in a single suit whenever such course was convenient and could be followed without prejudice to the defendant. Joinder was compulsory for all persons without whom a complete settlement of the transaction could not be effected. Every one whose interests would be directly affected by the decree was thus a necessary party as distinguished from merely a proper party."

See Clark, Code Pleading, p. 245. Then in a note on page 245 Clark observes that the terms used are those used by the United States Supreme Court, and the terms most usually used in equity pleading to distinguish the kinds of parties.

"It has been objected," Clark says, "that the terms 'necessary' and 'indispensable' convey the same idea. *Mathieson* v. *Craven*, 1908, 3 Cir., 164 F. 471. But a distinction has been drawn. While necessary parties are so interested in the controversy that they should normally be made parties in order to enable the court to do complete justice, yet if their interests are separable from the rest and particularly where their presence in the suit cannot be obtained, they are not indispensable parties. The latter are those without whom the court cannot proceed." (Citing numerous cases.) Clark, Code Pleading, n. 21, p. 246.

If such a distinction should be recognized it is our conclusion that in order to permit the bringing of a true representative suit, all those for whom the named plaintiff seeks to sue would have to be "necessary" parties.

The second requirement for a true representative suit

is that the person who purports to represent others of the class must in fact do so. This is known as the doctrine of "virtual representation." Annotation in 132 A. L. ■ R. 749. The doctrine requires that the person who purports to sue on behalf of others of the class must have such an identity of interest with those whom he seeks to represent that he will in fact necessarily represent them by representing himself. As noted on page 750 of the annotation in 132 A. L. R., supra,

"The doctrine of virtual representation is generally said to be based upon considerations of justice, convenience, and necessity. The application of this rule is justified by the consideration that the persons joined and those not joined have a common interest; that the former may be depended upon to bring forward the entire merits of the controversy, in their own self-interest; and that the persons not joined are thus sufficiently represented and protected by the nominal parties."

It is impossible to summarize for all situations just when a sufficient identity of interest exists to employ a class suit (see Clark, Code Pleading, p. 281), but in order to accord due process of law to those not joined it is necessary that there in fact be actual representation before it be held that they are to be bound by the judgment entered. *Hansberry* v. *Lee,* 311 U. S. 32, 61 S. Ct. 115, 85 L. Ed. 22, 132 A. L. R. 741.

The third requirement is that there be a question of common or general interest to many persons or that the parties be so numerous that it is impracticable to bring them all before the court. It is noted by Clark on page 278 of his work on Code Pleading that it is not ■ necessary that there be both a common question and numerous persons in the class. But in view of the requirement that there be an identity of interest it is difficult to imagine a case where there would not always be a common question. See discussion of this point in Pomeroy, Code Remedies, p. 381, § 286.

Thus, for a true representative suit there must be a case

where all of the parties for whom the named plaintiff sues would have been necessary parties; second, there must be an identity of interest (virtual representation); and third, there must be a question of common or general interest to many, or the parties must be so numerous that it is impracticable to bring them all before the court. It must be noted, however, that suits representative in form as distinguished from a true representative suit may be brought without meeting the above requirements, but the parties in whose behalf the suit is thus brought will not be bound by the decision rendered therein unless and until they are actually brought before the court by some appropriate proceeding. Such suits are, as noted by Clark, supra, more in the nature of intervention or of consolidation of actions. One requirement that must be met under this latter type of suit is that all the persons be in such a class that their joinder as actual parties plaintiff would have been permissible. The allegation in such a suit that the suit is brought in behalf of others may be treated as an invitation to join and when each joins he may claim the benefit of the suit insofar as it has progressed at the time of his joinder. This phase of the problem will be more fully discussed in connection with the facts of this particular case.

We do not understand the appellants in this case to contend that this is a true representative suit in all of its aspects. In reference to the essential elements of a true representative suit as detailed above it may be noted the allegations are sufficient to show the existence of many parties situated similarly to the named plaintiffs so that that phase of the case need not be further considered. To show an identity of interest and to show that all of the defrauded certificate holders are necessary parties the appellants rely upon the allegations of insolvency and the mismanagement and misappropriation of funds.

It would seem relatively clear that where numerous persons in equity own a fund which is held by a defunct

association or corporation, each would have an interest in any proceeding involving the liquidation or depletion of the fund. If one were to be permitted to proceed alone to recover and collect a judgment, he, at the expense of all others, would obtain full recovery. Those least diligent would in the end get nothing. When it is made to appear that all of the creditors have a common interest in the fund and that all cannot be paid in full, one should not in equity be allowed to proceed alone, solely in his own behalf, to recover his claim in full at the expense of the others. See *Logan* v. *Equitable Trust Co.*, 145 Or. 684, 29 P. 2d 511; *Bell* v. *Mendenhall*, 71 Minn. 331, 73 N. W. 1086 and 78 Minn. 57, 80 N. W. 843; *Iauch* v. *DeSocarras*, 56 N. J. Eq. 524, 39 A. 381.

The principle is developed in *Guffanti* v. *National Surety Co.*, 196 N. Y. 452, 90 N. E. 174, 176, 134 Am. St. Rep. 848. In this case one Zanolini was engaged in selling steamship tickets and in conjunction he received deposits of money for the purpose of transmitting the same or its equivalent to various foreign countries. To assure the depositors that he would perform his agreement he, pursuant to a statutory requirement, deposited a bond. Some 150 individuals in separate transactions deposited money with him. He converted these various sums to his own use. The action was commenced to reach the money due on the bond. The amount of the bond was not sufficient to pay in full for all the money converted. The court in holding that this should proceed as a representative suit stated:

"Surely this is a case where a suit in equity will aid to distribute, so far as possible, the limited fund represented by the penalty of the bond in accordance with the intention of the statute."

The court also said:

"* * * but the bond is for the benefit of every person who deposits money with a corporation, firm, or person named in the act, and, where the facts require it, the court will exercise its equitable powers to prevent the amount of the penalty thereof being paid to some of the persons defrauded to the exclusion of others, equally entitled to payment therefrom."

See also *Tobin* v. *Portland Flouring Mills Co.*, 41 Or. 269, 68 P. 743, 1108, wherein numerous despositors of grain in a grain elevator joined to bring a representative suit to reach grain on deposit which was not sufficient to permit each depositor to recover his grain in full.

While in the law the various defrauded certificate holders must be held to have parted with their certificates and occupy the position of tort claimants, in equity the pleadings show grounds for restoring them to their status as certificate holders. The wrongs of the ■ defendants destroyed their unity of action to proceed as certificate holders and it is agreeable to equity that the plaintiffs should be permitted to act together in protecting themselves from the dissipation of available assets which might be used to remedy the said wrongs. To hold otherwise would permit the defendants to triumph from their frauds.

The complaint alleges that there are not sufficient assets to pay the various claims of the defrauded certificate holders. Had it not been for the frauds complained of the various defrauded certificate holders would all be contract claimants. As noted above a court of equity will not permit the defendants to gain from the fact that the claims of the defrauded certificate holders may be in the nature of tort rather than contract. The complaint alleges that the defendant Colonial Corporation and the Association are insolvent. Each of the defrauded certificate holders has an interest in any proceeding which will liquidate or distribute the available assets. The court should not proceed to distribute the fund without giving all such claimants an opportunity to come in and present their claims. The requirement that a true representative suit must involve a situation in which all parties represented would have been necessary parties had it not been for their large number is therefore met if it be held that the end objective of this suit is to distribute the fund. On the other hand, if this suit is only proper for the purpose of marshaling the assets and impounding the fund, etc., then all of

these defrauded certificate holders would not be necessary parties. Any one of them could proceed alone to accomplish this latter purpose. Thus if it be held that this suit is only for the immediate purpose of impounding and marshaling the assets it is not a true representative suit. The necessity for one to appear as representative of another would not exist for all of the parties would not be necessary parties. They become necessary parties only when it is necessary to determine the share of each in the fund.

The question as to whether there would be virtual representation of those parties not named depends upon whether the immediate objective of the suit is to marshal and impound the assets. If so, then the named plaintiffs in asserting their own self interest would necessarily represent all other defrauded certificate holders. Each would be interested in every step of the proceeding to impound the assets until the various claims of the defrauded certificate holders would be established. On the other hand, there would not be true or virtual representation if the fund were to be distributed or if any of the parties were permitted directly to establish his claim in this phase of the suit. Each of the defrauded certificate holders will, under the allegations, be required to take less than the full amount of his claim because of the limited assets and the number and size of the claims. If some of the claims were to be defeated or disallowed, the remaining claims would have more assets left for their satisfaction. Each claimant is therefore interested to a certain extent in defeating the establishment of claims by another.

In addition, each defrauded certificate holder was induced to part with his certificate in a separate transaction. Even though there was a common scheme to defraud, the transaction in which each certificate holder parted with his certificates was in fact separate. Different facts would be required to prove each separate fraud. Different misrepresentations were made. One may have relied upon one misrepresentation while another did not rely on the misrepresentation at all. Further, each defrauded certifi-

cate holder has the right to elect whether he will rescind or sue in tort for damages. No one person can make the election for any other person merely by bringing a suit representative in form. The conclusion is inevitable that there would not be virtual representation beyond the point of marshaling the assets and impounding the fund.

It should here be noted that while we in equity for the purpose of permitting the marshaling of the assets and impounding the fund will treat the various defrauded certificate holders as though they still owned their certificates, this only can be done in respect to the phase of the suit relating to the marshaling of the assets and impounding the fund. But as to the phase of the suit brought for the very purpose of rescinding the various frauds, we must recognize the fact to be that the plaintiffs have parted with their certificates and that they are joining many causes of action for rescission and attempting to elect the remedy for those not joined as named plaintiffs. As noted in the annotation 114 A. L. R. 1015 at 1016, "class or representative suits to obtain the rescission of transactions based on similar frauds practiced by one defendant upon various, and commonly numerous, persons have so often been held not maintainable that one may well doubt whether under any circumstances such a suit will lie." The suit thus has two phases. The first phase is to impound the fund, appoint a receiver, etc. For this phase the parties may all be treated as though they still owned their certificates. They may join their various claims as though they were still certificate holders for the purpose of obtaining and holding this fund. The second phase will develop only if the fund is impounded and the court is confronted with the problem of distributing the fund. At this point equity can no longer treat these plaintiffs as though they still owned their certificates, for at this point the very issue for determination will be whether they were defrauded. When this second point or phase is reached, the suit can no longer proceed in representative form. Some machinery for the determination of the validity

of each claim must be used where separate trials can be had if necessary. The machinery to be used will be subsequently discussed.

It follows that this is not a true representative suit in all its phases. If it is permitted in representative form to go beyond the point of marshaling the assets and impounding the fund, the element of "virtual representation" is lacking. If it is directed only toward impounding the fund, rather than distributing it, the other defrauded certificate holders would not be necessary parties.

As noted by Blume, there are many situations in which one or more may bring suit in the form of a representative suit although joinder is deemed permissive and not required. The statement by the plaintiff who starts the suit that he sues for himself and others like situated is neither false nor absurd and should not be ignored as surplusage. If the term "representative" is unsatisfactory, the suit might be called "an action inviting joinder." Illustrative of the type of cases in which suits have been permitted to proceed representative in form even though one could have sued alone are the following: *Duke* v. *Boyd County*, 225 Ky. 112, 7 S. W. 2d 839 (a suit by one policeman to recover an award of $5 given to each policeman for each arrest under a particular statute) ; suits for injunctive relief such as *Climax Specialty Co.* v. *Seneca Button Co.*, 54 Misc. 152, 103 N. Y. S. 822 (where it was claimed the defendant had cut off a common water supply of the named plaintiff and others whom plaintiff represented) ; a creditor's suit to set aside a fraudulent transaction such as in *Edmeston* v. *Lyde,* 1 Paige, N. Y., 637, 19 Am. Dec. 454, and *Hammon* v. *Hudson River Iron & Machine Co.,* 20 Barb. N. Y. 378; to enjoin the collection of a tax, *Kvello* v. *Lisbon,* 38 N. D. 71, 164 N. W. 305; *Hawarden* v. *Youghiogheny & Leigh Coal Co.,* 111 Wis. 545, 87 N. W. 472, 55 L. R. A. 828 (suit to enjoin a conspiracy to drive the plaintiff and others out of business) ; *Atkins* v. *Trowbridge* (reviewed twice) first opinion, 162 App. Div. 161, 147 N. Y. S. 275; second opinion, 162 App. Div. 629, 148 N. Y. S. 181 (involving

an action at law brought by plaintiffs and other holders of similar certificates to recover for breach of an agreement by defendant to purchase a particular issue of bonds. However, in this case the court finally held that only those persons who intervened before judgment could claim the benefits of the suit) ; *McCann* v. *City of Louisville,* 63 S. W. 446, 23 Ky. Law Rep. 558 (here a number of persons had paid sums of money to contractors upon apportionment warrants for the cost of construction pursuant to a city ordinance of various cisterns, wells, fire hydrants, and water attachments. Two suits were brought by property owners for themselves and others similarly situated to recover from the city the sums so paid. Before these two suits were litigated some thirteen hundred other separate suits were started by individual property owners in two justice of the peace courts to recover the amount paid by each. Writs of prohibition were issued to the justices' courts to restrain them from trying the said thirteen hundred cases. The holding in the McCann case was that the two suits commenced in the circuit court were proper representative suits) ; see also cases collected in note at page 278, n. 190 in Clark "Code Pleading."

From the above cases it can be readily seen that suits are permitted to proceed in representative form even though one of the plaintiffs could have brought suit alone and solely for his own benefit. The tests for determining just when such a suit may be brought are not clear from the cases. It can probably be said that the tests which equity applied prior to the passage of the joinder statutes would be applicable in determining whether a suit could be brought representative in form. Since the suit is in the nature of intervention or consolidation of actions, and since only those who elect to come in can claim the benefits of the suit, it would appear that one requirement would be that all those represented must occupy such a position in relation to each other and to each named plaintiff that all could have joined as named parties plaintiff, either under compulsory or permissive joinder

statute. See discussion of this point by Pomeroy, Code Remedies, 4th Ed., § 392. This further appears from the fact that if one of those represented desired to come in as a named plaintiff and assist in the control of the suit he should be permitted to do so. *Manning* v. *Mercantile Trust Co.*, 37 Misc. 215, 75 N. Y. S. 168. Those represented are to a certain extent in the suit from the beginning even though eventually they may elect not to join. For example the statute of limitations ceases to operate against all members of the class who do elect to join and the statute will be tolled as of the time the suit starts rather than at the time of joinder. See *State* v. *District Court*, 90 Mont. 213, 300 P. 544; *Richmond* v. *Irons*, 121 U. S. 27, 7 S. Ct. 788, 30 L. Ed. 864; *Dunne* v. *Portland St. R. Co.*, 40 Or. 295, 65 P. 1052; *Brinckerhoff* v. *Bostwick*, 99 N. Y. 185, 1 N. E. 663. And it has been held that if a person in whose behalf a suit is brought has an opportunity to come in and claim the benefits of the suit neglects to do so, he will then be foreclosed from participating in the proceeds of the judgment. *Kerr* v. *Blodgett*, 48 N. Y. 62.

The requirement that all be in such a position to the subject matter of the suit and to each other plaintiff that all could have joined as named plaintiffs is met as to the phase of the suit brought to impound and marshal the assets. Each defrauded certificate holder would be interested in the subject matter of the suit and in the relief demanded within the requirements of Section 104-3-12. However, the requirement would not be met as to that phase designed to establish the several claims of the various defrauded certificate holders, for as noted above they cannot join to recover damages or to rescind.

It must be noted, however, that not every case of permissive joinder could necessarily proceed in representative form. The doctrine of virtual representation applies with equal vigor in suits of this type. No person can be heard to say that he represents another unless under the fact situation he does so. Too, the requirement that there be a question of common or general interest to many or that

the parties be so numerous as to make it impracticable to bring them all before the court must be met. As noted in the discussion above, both of these requirements would be met by a suit brought to marshal the assets and impound the fund. But virtual representation would be lacking as to all proceedings beyond that point.

No case has been cited in which persons situated in like position to the defrauded certificate holders in this action have been permitted to bring a representative suit to both reach and distribute the assets. Nor have we been able to locate such a case through our research. The case of *Black* v. *Simpson*, 94 S. C. 312, 77 S. E. 1023, 1024, 46 L. R. A., N. S., 137, involved a very similar fact situation except for the fact that all of the defrauded persons actually joined so that a representative suit was not necessary. The case is of interest because it represents the most liberal view in this regard that we have been able to locate involving similar statutory provisions. The court summarized the allegations of the complaint in that case as follows:

"The defendant Arthur O. Simpson was a director and general manager of the Farmers' Fertilizer Company in which the plaintiffs were shareholders. The defendant, while occupying this trust relation to the plaintiffs, conceived and entered upon a scheme of acquiring the entire corporate assets at much less than their actual value by representing to each of the plaintiffs that the corporation was not prosperous, but financially embarrassed, and thus having assigned to him the shares of each of the plaintiffs at much less than their real value. The defendant successfully carried out his scheme by means of the false representations to the plaintiffs as to the condition of the corporation and the value of its property; thus, in breach of his trust, induced the plaintiffs and other shareholders to sell him their stock. After thus acquiring all, or nearly all, the shares of stock, he sold 'the stock, franchises, real estate, buildings and machinery' at much more than he paid the shareholders, to his great profit and to the great loss of the plaintiffs."

The defendant demurred on grounds that the complaint improperly joined several causes of action and that there was a misjoinder of parties plaintiff.

By a divided court it was held that there was no misjoinder of causes or parties.

The South Carolina Code provision on joinder of parties plaintiff was substantially identical with our 104-3-12. In concluding that these plaintiffs could properly join the majority said:

"His [defendant's] duty was to manage the corporate property for the benefit of the stockholders; and in the performance of that duty he was chargeable with the utmost good faith. It was a breach of his trust to all of the stockholders to use any means to acquire for himself the corporate property, except in the open after giving to the stockholders, fully and candidly, all material information he possessed as to its condition and value. Yet, according to the complaint, he entered upon a scheme to control the corporation and acquire the corporate property for his own advantage by positive concealment as to the real condition of the corporation and the value of its property. Each separate purchase of the shares of the stockholder was but one step in the general scheme to defraud the stockholders, as a class, consummated by the acquisition of all, or nearly all, of the stock and the subsequent sale of the corporate property at a great profit.

"Looking at the complaint in this its full scope, it seems to me clear, both on reason and authority, that the plaintiffs as cestuis que trust may maintain a joint action against the common trustee for an accounting for the profits made by him in breach of his trust at their expense, each being charged in the accounting with the amount received by him from the trustee in the course of the execution of the fraudulent scheme. The subject of the action is the consummated scheme to defraud the stockholders, the cestuis que trust of the defendant; and all the plaintiffs are interested in the relief of an accounting. Hence the joinder is allowed by section 176 of the Code of Procedure, which provides that 'all persons having an interest in the subject of the action, and in obtaining the relief demanded, may be joined as plaintiffs.' "

The holding of the last cited case finds some support in the case of *Bradley* v. *Bradley*, 165 N. Y. 183, 58 N. E. 887.

The result reached by these last two cited cases seems just. Were it not for the defendants' frauds the defrauded certificate holders in this case would have such an identity

of interest that there would be virtual representation not only to impound and marshal the fund, but since each claim would be based on an identical contract, to distribute it as well. To hold that they cannot proceed in representative form to seek redress for these wrongs permits the defendants to triumph from their wrongs, a result which certainly is not favored. But there is not virtual representation here beyond the point of marshaling the assets and impounding the fund. Each defrauded certificate holder is interested in any proceeding to distribute or liquidate the fund, but one is not at all representative of the others from the standpoint of establishing his claim. No one in the advancement of his own self interests would of necessity represent the claims of the others. It is in this respect that the case differs from *Black* v. *Simpson,* supra. The latter case involved no question of virtual representation, for all were joined as named plaintiffs and each could be expected to look out for his own interests. We have been able to find nothing going beyond the *Black* v. *Simpson* case.

We therefore conclude that this suit may proceed in representative form up to the point of appointing a receiver and impounding and marshaling the assets, but it cannot proceed in representative form in the trial of the fraud issues nor to establish the validity of any claim. If the allegations of mismanagement, continued fraud, threatened dissipation of fund and insolvency can be proved, a receiver would likely follow as a matter of course. Once a receiver is appointed, receivership mechanism could be used to dispose of the various claims. Each defrauded certificate holder should then be given an opportunity to come in and claim the benefits of the suit so far as they had accrued and an opportunity to present his claim. If the claim were rejected by the receiver the usual procedure could be followed to determine the validity of the claim. The named plaintiffs as well as those not named would of course have to present their claims. That portion of the prayer seeking the complete adjudica-

tion of the validity of each claim in this suit may be disregarded as surplusage. *Rohr* v. *Stanton,* 78 Mont. 494, 254 P. 869. When so disregarded the complaint states a proper representative suit to accomplish the result of marshaling and impounding the assets and appointing a receiver. If the plaintiffs should be unable to establish grounds for preserving, impounding and marshaling the assets, so that the first phase of the suit would be unsuccessful, the second phase as outlined above would never develop. There would be no fund to distribute and thus no need insofar as this proceeding is concerned to determine the respective rights of the defrauded certificate holders. Whether the plaintiffs (named and unnamed) could wait until after this suit failed to commence separate suits without the risk of being successfully met by a plea of the statute of limitations we now express no opinion, except to observe that there would have been no adjudication on the merits of the individual claims and they are sufficiently presented by the instant suit to enable those not named as well as those named to come in if the fund is impounded and claim the benefits of the suit.

From what has been said above it follows that the demurrer for misjoinder of parties should have been overruled. The plaintiffs could properly join for many of the purposes which they seek to accomplish. When for any purpose disclosed by the complaint joinder is proper it is error to sustain a demurrer for misjoinder of parties. *Speyer* v. *School Dist. No.* 1, 82 Colo. 534, 261 P. 859, 57 A. L. R. 203. Were the nature of the various causes of action to be determined by the prayer, then it clearly would appear that there is a misjoinder of causes. Our holding that the suit cannot proceed in representative form to rescind the several fraudulent conveyances should dispose of the questions arising from the demurrer for misjoinder of causes. If the plaintiffs desire to proceed in accordance with this opinion, the prayer asking for joint relief from the several frauds should be disregarded

as surplusage. When this is done, it appears that the remaining causes are joinable.

The plaintiffs allege that they did not discover the fraud perpetrated by the defendants until 2½ years before the commencement of this action, apparently in anticipation of a plea of the statute of limitations. Sec. 104-2-24 (3), U. C. A. 1943. Defendants do not specifically ■ plead the statute of limitations, but they claim uncertainty and contend that the plaintiffs are required to plead the facts regarding the discovery of the fraud and explain why it was not sooner discovered. The trial court ruled that the complaint was insufficient in this regard and this ruling is questioned by the appellants. The appellants cite *Alexander* v. *Cleland*, 13 N. M. 524, 86 P. 425; *Stearns* v. *Hockbrunn*, 24 Wash. 206, 64 P. 165; *Kansas Pac. Ry.* v. *McCormick*, 20 Kan. 107; *Zieverink* v. *Kemper*, 50 Ohio St. 208, 34 N. E. 250, in support of their contention that it is only necessary for them to allege in the terms of the statute that the fraud was not discovered until a date within the period of limitations. These cases support that proposition. There are, however, a number of cases to the contrary, including *Salt Lake City* v. *Salt Lake Investment Co.*, 43 Utah 181, 134 P. 603, 607. In that case we held that merely alleging by way of conclusion that the plaintiff had no knowledge of the fraud was insufficient and that the complaint must contain a "clear and concise statement of fact from which the lack of knowledge or information is deducible." If this case is to be followed, we must hold that the allegations concerning the discovery of the fraud are insufficient.

Had the complaint totally failed to include any allegation regarding the date of the discovery of the fraud it would nevertheless still have stated a cause of action. Statutes of limitations are matters of repose which can be either raised or waived by the defendant. Until it is made to appear that the defendant desires to seek repose behind a statute of limitations the benefits of such a statute will

not be given to him. A plea of the statute of limitations is a matter of affirmative defense and at the outset it might be noted that it is rather unusual to require the plaintiff to anticipate such a defense by allegations in his complaint. Rather it would seem that the complaint could be filed with the assumption that no such defense would be interposed. If by answer the defendant claimed such affirmative defense, the plaintiff could meet such defense by his reply. Otherwise, the complaint might be burdened with many allegations set forth solely for the purpose of anticipating a defense which might never be raised. Under this line of reasoning no allegations regarding the discovery of the fraud should logically be needed in the complaint. But we in the past have permitted defendants to interpose the defense of the statute of limitations by demurrer to the complaint. In *Johanson* v. *Cudahy Packing Co.*, 107 Utah 114, 152 P. 2d 98, we noted that Section 104-8-1, U. C. A. 1943, provides for only seven grounds for demurrer to a complaint and that a demurrer on the grounds that the action is barred by the statute of limitations does not fall within any of the seven grounds enumerated. Yet the practice has developed and been approved by this court of permitting a demurrer on this ground. *O'Donnel* v. *Parker*, 48 Utah 578, 160 P. 1192; *Johanson* v. *Cudahy Packing Co.*, supra. The desire to have a settled practice discourages the overruling of these cases.

Our holdings permitting a demurrer on the grounds that the cause appears to be barred by a statute of limitations has the effect of forcing a plaintiff to anticipate a defense. A rule requiring the plaintiff to set out in great detail his avoidance of said anticipated defense does not seem to have practical merit. A general allegation that he did not discover the fraud until a date within three years of the commencement of the action should be sufficient to get him past a demurrer. We should not saddle upon the plaintiff the burden of detailing facts which would negative an inference that he should have discovered

the fraud sooner, when in fact the defense may never be raised. Because of our practice of permitting a demurrer on the grounds that the cause appears to be barred by the statute of limitations, we are inclined to the view set forth by the cases upon which the plaintiffs herein rely, which cases are cited above. To the extent that the *Salt Lake City* v. *Salt Lake Investment Co.* case is in conflict with this it is overruled.

By way of demurrer the defendants maintained that the complaint was uncertain in several other particulars. Without detailed discussion we hold that the complaint was sufficiently certain in the allegations regarding the creation of a sham and fictitious market; that sufficient facts showing the common scheme to defraud are alleged; that it was not necessary for the plaintiffs to allege the exact sums of money improperly transferred from the treasury of the Association. As to the first two of these sufficient facts are set forth to permit the defendants to answer; and as to the third, it would appear that the facts would be peculiarly within the knowledge of the defendants.

On the other hand the allegations that plaintiffs were induced to surrender their certificates for "practically nothing" or for "various properties of inconsequential value" or "without substantial value" were not sufficiently certain under the prayer for relief. If rescission were to be allowed, the Association would be entitled to a return of the properties or if damages were allowed to a credit for the value or payment actually made. *Badger & Co.* v. *Fidelity Building & Loan Ass'n,* supra. If by "inconsequential value" is meant "no value" and by "practically nothing" is meant "worthless," plaintiffs could so state. If given something other than money, plaintiffs could easily plead the approximate value or that it was worthless, whichever is the fact. Defendants could then raise an issue as to value or payment. However, our holding that the plaintiffs could not properly join, under

the allegations of the complaint, to rescind the various fraudulent transactions by which the defendants acquired the stock of each plaintiff or to get judgment for damages suggests a change in the complexion of these allegations. If all the plaintiffs sought to do was to impound the fund, start orderly proceedings to liquidate the Association, enjoin the transfer or dissipation of the assets, etc., it would not be necessary to set forth the above matters with the degree of particularity required were they to be permitted to rescind each fraudulent conveyance or recover damages. If the objective of the suit is so limited, we believe that these allegations would be sufficiently certain.

It is urged by respondents that if the lower court be sustained on any one of the numerous rulings, the judgment dismissing the complaint must be affirmed. We have, however, under certain circumstances, done otherwise where justice could be done by permitting an amendment. See *Johanson* v. *Cudahy Packing Co.*, 100 Utah 399, 115 P. 2d 794, on rehearing 101 Utah 219, 120 P. 2d 281, and *Johanson* v. *Cudahy Packing Co.*, 107 Utah 114, 152 P. 2d 98. The matter is remanded with instructions to permit the plaintiffs to amend and proceed in accordance with the holding of this court. Each party to stand his own costs.

McDONOUGH and WADE, JJ., concur.

LARSON, Justice (concurring).

I concur. I reserve from my concurrence, however, some matters in the last part of the opinion. I think there should be no question about either the propriety or the logic of raising the question of the statutes of limitations by demurrer.

Nor can I concur in the statements that there is any conflict, or apparent conflict, between the holding in this opinion and the opinion in the case of *Salt Lake City* v. *Salt Lake Investment Company*, 43 Utah 181, 134 P. 603,

and therefore any attempt to overrule or limit the investment company decision is unnecessary and erroneous. In the investment company case the complaint showed by direct allegations that the facts upon which the alleged fraud was predicated were at the time of the alleged fraud, and at all times since, within the knowledge of the plaintiff. It also showed that the fraud of which plaintiff complained was primarily the fraud of plaintiff's agent rather than the fraud of defendant. After pleading such facts, plaintiff sought to avoid the bar of limitations by merely pleading that it had not discovered the fraud earlier. This court held that where one admits he was in possession of all the facts upon which he seeks to predicate fraud (and he is charged with knowledge of the law) he cannot avoid the bar of the statute unless he pleads facts to show why he was unaware of the facts which he now claims constituted a fraud. I find nothing in the investment company case which even implies a holding that in a case such as this it is necessary to plead more fully than here done to avoid the bar of the limitations statute.

MOFFAT, J., deceased.